# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT KNOXVILLE

| | | |
|---|---|---|
| **JOHN MCGLONE,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 3:11-cv-405** |
| | ) | **(Phillips)** |
| **JIMMY G. CHEEK, in his official capacity** | ) | |
| **as Chancellor of the University of Tennessee** | ) | |
| **at Knoxville, et al.,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

### I.      Introduction

This matter is before the Court on Plaintiff John McGlone's Motion for a Preliminary Injunction [Doc. 7] and Defendants' Motion to Dismiss [Doc. 18]. For the reasons set forth in this Memorandum and Order, Plaintiff's Motion for a Preliminary Injunction is **DENIED** and Defendants' Motion to Dismiss is **GRANTED**.

### II.     Statement of the Facts

This civil rights action challenges access and speech policies at the University of Tennessee at Knoxville that impose a sponsorship requirement on speakers wishing to express their beliefs on campus. In ruling on the instant motions, the Court accepts as true McGlone's averments as to the facts. The Court is not required to hold an evidentiary hearing on a motion for a preliminary injunction if, as here, the defendants do not dispute the material facts presented by the plaintiff, and if the issues before the Court are primarily questions of law. *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 552-53 (6th Cir. 2007).

## A.    The Parties

Plaintiff John McGlone is a resident of Breeding, Kentucky. [Compl., Doc. 1, ¶ 8.] McGlone is a committed Christian, and his religious beliefs require him to share his religious faith with others. *Id.* ¶ 12; [McGlone Aff., Doc. 7, Attach 1, ¶ 2.] In order to satisfy this duty, McGlone regularly travels to public universities and speaks in outdoor spaces on campuses where he has access to college students: the segment of the population he believes is best suited to "shape the future." [Compl. ¶ 13.] His stated purpose is to expose students to the teachings of Christianity in a respectful, yet peaceful, manner. *Id.* ¶ 17.

McGlone shares his religious beliefs with students through dialogue, distribution of literature, and display of signs. *Id.* ¶ 14; [McGlone Aff. ¶ 4.] He conducts these activities as an individual and as part of small groups. [Compl. ¶ 14.] McGlone does not ask for money or ask anyone to join any organization. *Id.* ¶ 15. He states that he is not violent, never harasses anyone, and does not try to force anyone to listen to him or accept his literature. *Id.* ¶ 16. He also does not litter, use sound amplification devices, or create any disturbance or vehicle or foot traffic congestion concerns. *Id.*; *see also* [McGlone Aff. ¶¶ 4-9.]

The University of Tennessee at Knoxville ("UT") is located in Knoxville, Tennessee and is the flagship public university of the state of Tennessee. [Compl. ¶ 18.] It enrolls roughly 27,000 students and employs roughly 8,161 faculty members. *Id.* ¶ 19. Its campus spreads over 560 acres and contains approximately 236 buildings. *Id.* UT's campus contains sidewalks, park areas, grassy knolls, amphitheaters, and pedestrian malls, all of which are open to the general public. *Id.* ¶ 22. Outside areas on UT's campus particularly relevant to this action include the pedestrian

walkway on Andy Holt Avenue, the amphitheater near the Humanities and Social Sciences Building, and Circle Park. *Id.* These open areas on UT's campus attract many visitors each year. *Id.* ¶ 21.

Defendant Jimmy Cheek is Chancellor of UT and "oversees all aspects of the university . . . includ[ing] oversight of policies that regulate and control expression." *Id.* ¶ 9. Defendant Maxine Davis is Dean of Student Affairs and "is responsible for interpreting and administrating regulations that pertain to expressive activities on the UT campus, including the sponsorship requirement imposed on outside speakers." *Id.* ¶ 10. Defendant Angi Smith is Associate Dean of Students and "is responsible for administrating regulations that pertain to activities on the UT campus, including the sponsorship requirement imposed on outside speakers." *Id.* ¶ 11.

**B.    Relevant UT Policies**

Several UT policies are directly relevant to the claims at issue in this case. The first university policy, entitled "Access to University Property," was adopted by the UT Board of Trustees in 1970, and was promulgated under the rulemaking provisions of the Tennessee Uniform Administrative Procedures Act, Tenn. Code Ann. § 4-5-101, *et seq.* The policy reads:

> 1720-1-2-.01 RESTRICTIONS. The University's campuses and facilities shall be restricted to students, faculty, staff, guests, and invitees except on such occasions when all or part of the campuses, buildings, stadia, and other facilities are open to the general public.

[Mot. for Prelim. Inj., Doc. 7, Attach. 5.] The second policy, entitled "Access to Campus" can be found in the university's student handbook, "Hilltopics." The policy provides in part:

> The university's campuses and facilities shall be restricted to students, faculty, staff, administrators, guest-visitors and invitees except on such occasions when all or part of the campuses, buildings, stadia, and other facilities are open to the general public.

[Mot. to Dismiss, Doc. 18, Attach. 1, at 2.] The handbook defines "guest-visitor" as "[a] person invited by a university student or employee to visit the campus at a specific time, place, and

occasion." *Id.* at 1. The handbook excludes from the definition of "university grounds" all "[c]ampus streets and adjoining sidewalks maintained by the City of Knoxville." *Id.* at 2. Finally, a separate subsection of the handbook's general policies, entitled "Freedom of Expression and Speech," reads:

> The University of Tennessee considers freedom of inquiry and discussion essential to educational development and recognizes the right of students to engage in discussion, to exchange thoughts and opinions, and speak freely on any subject in accord with the guarantees of our state and national constitutions. Additionally, the university endeavors to develop in students a realization that citizens not only have the right but the obligation to inform themselves regarding issues and problems of the day, to formulate stands regarding these issues and problems, and to give expression to their views. . . . The University of Tennessee takes pride in the f act that its campus is open to free discussion and examination of views, with the condition that such discussion be accompanied by peaceful methods and under peaceful conditions consistent with the scholarly nature of an academic community.

> To these ends, registered student organizations on campus may freely select, without prior restraints, persons they wish to invite as guest speakers. There are no restrictions to control the point of view expressed by speakers other than those imposed by local, state, and federal laws. Any person sponsored by a registered campus organization is free to speak. . . .

> Any student group inviting a speaker must register the name of the speaker, the date and time of the appearance, and such pertinent information as will facilitate adequate physical preparations and adequate publicity for the event with the Office of the Dean of Students. Officers and program chairpersons of all registered organizations are advised that reasonable notice will be necessary to handle requests for facilities and security. The criterion for a negative decision will be a demonstrable inability to make such physical arrangements. The events scheduling procedure will not be used as a device for a prior restraint of speakers. When a negative decision on a particular speaker must be made, the sponsoring organization is free to seek a more suitable date. It shall be the responsibility of the Dean of Students to consider and dispose of procedural complaints.

*Id.* at 3.

## C.    The Events

From 2008 to August 2010, McGlone visited the outside areas on UT's campus five times to express his religious beliefs. [Compl. ¶ 27.] He usually would use the open-air amphitheater located on the pedestrian parkway to express his beliefs. *Id.* ¶ 29. On his first visit, McGlone showed up, expressed his beliefs, and left without incident. *Id.* ¶ 28. On subsequent visits, McGlone contacted UT officials as a courtesy prior to arriving to alert them to his presence. *Id.* McGlone did not obtain sponsorship during these visits, and UT officials never indicated any problem with McGlone's expression on campus and never tried to stop him from speaking. *Id.* ¶¶ 28, 30.

On August 25, 2010, McGlone called UT and left a voice message informing UT officials of his intention to express his beliefs on campus the following day. *Id.* ¶ 31. Later that day, Defendants Davis and Smith returned McGlone's phone call, and Davis introduced Smith as the person in charge of the solicitation process for the campus, which included a wide variety of activities, including sharing information on campus. *Id.* ¶¶ 32, 33. Smith explained to McGlone that he would not be permitted to use the amphitheater or other open areas on campus for his expressive purposes unless he first obtained university-affiliated sponsorship. *Id.* ¶ 35. McGlone stated that he believed such a prohibition was unconstitutional, but he nevertheless requested sponsorship to speak in the amphitheater and on the pedestrian walkway. *Id.* ¶ 37. Davis and Smith declined to sponsor McGlone. *Id.* ¶ 38. McGlone asked Davis to provide contact information for UT's legal counsel. *Id.*

McGlone contacted University Assistant General Counsel Matthew Scoggins, who confirmed to McGlone that, under university policy, speakers not affiliated with the university must be sponsored by students, faculty, or staff in order to speak on campus. *Id.* ¶ 42. Scoggins emailed McGlone links to the two written university policies requiring such sponsorship: the "Access to

-5-

University Property" policy, and the "Access to Campus" policy. *Id.* ¶ 47; [Mot. for Prelim. Inj., Attach. 4.] During a telephone conversation on September 9, 2010, Scoggins reaffirmed to McGlone that the policies required McGlone to secure sponsorship from a student organization or faculty or staff member prior to speaking on campus. [Compl. ¶¶ 52-53.]

On April 13, 2011, McGlone emailed ten Christian-based student organizations and requested sponsorship so that he could speak on campus. *Id.* ¶ 55; [Mot. for Prelim. Inj., Attach. 7.] None of the groups responded to his solicitation for sponsorship. [Compl. ¶ 56.] Having been denied sponsorship from Davis, Smith, and the ten student organizations, McGlone concluded that it was futile to try to comply with the sponsorship requirement. *Id.* ¶¶ 55-56.

On June 6, 2011, McGlone's counsel wrote to the university asking that McGlone be permitted to speak on campus without complying with the university's sponsorship requirement, which McGlone and his counsel believed to be unconstitutional. *Id.* ¶ 59; [Mot. for Prelim. Inj., Attach. 8.] By letter on June 17, 2011, the Associate General Counsel of the Tennessee Board of Regents reaffirmed that the outside speaker sponsorship requirement required McGlone to obtain sponsorship from the students, faculty, or staff before engaging in public speaking on campus. [Compl. ¶ 60]; [Mot. for Prelim. Inj., Attach. 9.] The letter also stated that McGlone was free to speak to students on the streets and sidewalks bisecting UT's campus, where the sponsorship requirement did not apply. [Mot. for Prelim. Inj., Attach 9, at 3.]

Since interacting with Davis, Smith, and Scoggins on August 25, 2010, and for fear of arrest, McGlone has not returned to the UT campus for the purpose of expressing his viewpoints. *Id.* ¶ 67. McGlone's email to the student organizations on April 13, 2011 was his last attempt to obtain sponsorship. *Id.* ¶ 58. UT's sponsorship requirement remains in place. *Id.* ¶ 62. McGlone

-6-

states that, if not for the UT sponsorship policies and the actions of Defendants enforcing these policies, McGlone would immediately return to UT to share his message with its students. *Id.* ¶ 67.

## III.    Statement of the Case

On August 23, 2011, Plaintiff John McGlone filed suit in this Court under 42 U.S.C. § 1983 and § 1988 against Jimmy G. Cheek, in his official capacity as Chancellor of the University of Tennessee at Knoxville; Dr. Maxine Davis, individually and in her official capacity as Dean of Students at the University of Tennessee at Knoxville; and Angi Smith, individually and in her official capacity as Associate Dean of Students at the University of Tennessee at Knoxville. [Compl. ¶ 2.] This Court has jurisdiction over McGlone's claims pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has jurisdiction over McGlone's requests for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of Tennessee because Defendants reside in this district and all claims arise out of this district.

McGlone claims that UT's campus access and sponsorship policies, which restrict the use of the campus to "students, faculty, staff, guests, and invitees," and which require speakers not affiliated with the university to be invited by a student organization or faculty or staff member prior to speaking on campus, violate the First and Fourteenth Amendments of the United States Constitution. In his first cause of action—violation of the Free Speech Clause of the First Amendment—McGlone alleges that his religious speech is protected speech under the First Amendment and that UT's policy and practices, and the enforcement thereof, are vague and overbroad; restrain constitutionally protected speech in advance of its expression, without appropriate guidelines or standards to guide the discretion of officials charged with enforcing the

policy; chill the free speech and free exercise of religion of McGlone and other third-party citizens; allow the exercise of unbridled discretion; are not narrowly tailored to achieve any legitimate government purpose; and fail to leave open alternative avenues of communication. *Id.* ¶ 72.

In his second cause of action—violation of the Due Process Clause of the Fourteenth Amendment—McGlone alleges that Defendants' policies are vague and lack sufficient objective standards to curtail the discretion of officials, affording defendants ample opportunity to enforce the policies in an *ad hoc*, arbitrary, and discriminatory manner. *Id.* ¶ 75. McGlone contends that UT's sponsorship requirement is "hopelessly vague, empowering university officials and student groups with unlimited discretion to grant/deny speech requests for any conceivable reason." [Resp. in Opp'n to Mot. to Dismiss, Doc. 24, at 3.]

As compensation for their purported deprivation of his fundamental constitutional rights to free expression and due process, McGlone seeks injunctive and declaratory relief and nominal damages against Defendants. [Compl., Prayer for Relief, §§ A-G.]

On August 24, 2011, McGlone filed a Motion for a Preliminary Injunction, asking the Court to enjoin Defendants and their agents, servants, employees, attorneys, and all persons and entities in active concert or participation with them, directly or indirectly, from using the UT sponsorship policy to prevent McGlone from engaging in his desired and constitutionally protected speech activities. [Mot. for Prelim. Inj., at 1.] In the absence of a preliminary injunction, McGlone asserts that he will suffer irreparable injury in the loss of his rights and freedoms guaranteed by the United States Constitution. *Id.*

On September 30, 2011, Defendants moved to dismiss this action under Rule 12 (b)(6) of the Federal Rules of Civil Procedure, on the grounds that the Complaint fails to state a

claim upon which relief may be granted. [Mot. to Dismiss, at 1]; *see also Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1946-47 (2009); *Bell Atlantic Corp. v . Twombly*, 550 U.S. 544, 570 (2007). Defendants state that UT's sponsorship policy is consistent with the First Amendment, and that the Defendants' enforcement of the policy did not violate any of McGlone's constitutional rights. *Id.* Defendants also move to dismiss any claims for monetary damages against them in their official capacities because such claims are barred by the Eleventh Amendment, and move to dismiss the claims for damages against Defendants Davis and Smith in their individual capacities on the grounds that such claims are barred by the doctrine of qualified immunity. *Id.*

## IV.     Analysis

### A.     Motion to Dismiss

A motion to dismiss should not be granted if the Complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 550). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering a motion to dismiss, the Court must construe the complaint in a plight most favorable to the plaintiff, accept all well-pled factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of those allegations that would entitle him to relief. *Gilles v. Garland* ("*Garland*"), 281 Fed. App'x 501, 503 (6th Cir. 2008). The complaint must contain either direct or inferential allegations respecting all of the material elements to sustain a recovery under some viable legal theory. *Iqbal*, 129 S. Ct. at 1944; *Garland*, 281 Fed. App'x at 503.

### 1.      Failure to State a Claim

Because McGlone's Complaint divides his causes of action into "Freedom of Speech" and "Due Process Clause" claims, the Court will address his claims accordingly. However, the Court acknowledges that "where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Thaddeus-X v. Ball*, 175 F.3d 378, 386 (6th Cir. 1999) (citing *Albright v. Oliver*, 510 U.S. 266, 273 (1992)). McGlone's Fourteenth Amendment claim is based on the same allegations as the purported violations of his First Amendment rights: that Defendants' access and sponsorship policies are vague and lack sufficient objective standards to curtail the discretion of officials. Accordingly, though McGlone's claims are categorized as either "Free Speech" or "Due Process" for purposes of this Memorandum and Order, First Amendment jurisprudence will be the guide for analyzing both claims. *See id.*

### a.      Free Speech

Plaintiff charges that the UT sponsorship policy causes harm because it is an unconstitutional time, place, and manner restriction of and has a chilling effect on free speech.

The First Amendment prohibits the government from "abridging the freedom of speech." U.S. Const. amend. I. There is "no doubt that the First Amendment rights of speech and association extend to the campuses of state universities." *Garland*, 281 Fed. App'x at 508 (quoting *Kincaid v. Gibson*, 236 F.3d 342, 347 (6th Cir. 2001) (en banc)). However, the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983) (quoting *U.S. Postal*

*Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 129 (1981)); *see also Miller v. City of Cincinnati* ("*Cincinnati*"), 622 F.3d 534, 533 (6th Cir. 2010) ("Simply because the government may own a piece of property, however, does not mean that the property is open to all types of expressive activity at all times." ). It is well settled that "[t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985) (citing *Perry Educ. Ass'n*, 460 U.S. at 46).

"To determine the constitutionality of a government restriction on speech on publicly owned property, we consider three questions: (1) whether the speech is protected under the First Amendment; (2) what type of forum is at issue and, therefore, what constitutional standard applies; and (3) whether the restriction on speech in question satisfies the constitutional standard for the forum." *Cincinnati*, 622 F.3d at 533 (citing *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 559 (6th Cir. 2007)). Because there is no question that McGlone's religious speech is expressive activity protected under the First Amendment, *see, e.g.*, *Heffron v. Int'l Soc'y for Krishna Consciousness*, 452 U.S. 640, 647 (1981) (oral and written dissemination of religious viewpoint are protected speech), the Court will consider what type of forum is at issue and whether UT's restrictions on speech satisfy the constitutional standard for that forum.

### i.    Forum Analysis

The appropriate standard of scrutiny for a regulation of protected expression on government-owned property is determined by the nature of the forum. *Pleasant Grove v. Summum*, 129 S. Ct. 1125, 1132 (2009). There are four recognized types of forum: the traditional public forum, the designated public forum, the limited public forum, and the nonpublic forum. *Id.* Traditional

-11-

public fora include streets, sidewalks, parks, and other areas " which by long tradition or by government fiat ha[s] been devoted to assembly and debate." *Perry Educ. Ass'n*, 460 U.S. at 45. In such areas, the "rights of the State to limit expressive activity are sharply circumscribed." *Id.* Restrictions on speech in traditional public fora receive strict scrutiny: the government may enforce content-based restrictions only if they are narrowly drawn to serve a compelling governmental interest, and may enforce content-neutral regulations only if they are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.* at 45-46.

A designated public forum is a piece of public property that is not a traditional location of public debate or assembly, but which the government "opens . . . to the public at large, treating as if it were a traditional public forum." *Cincinnati*, 622 F.3d at 534. If the government opens a designated forum to the public for speech, it is bound by the same standards that apply in a traditional public forum. *Kincaid*, 236 F.3d at 348 (citing *Perry*, 460 U.S. at 46).

A limited public forum is one that is "limited to use by certain groups or dedicated solely to the discussion of certain subjects." *Cincinnati*, 622 F.3d at 534-35 (citing *Summum*, 129 S. Ct. at 1132). Recently, in *Miller v. City of Cincinnati*, the Sixth Circuit found that a city created a limited public forum when it opened its city hall building to private groups only if they obtained sponsorship from a city official or city department. *Cincinnati*, 622 F.3d at 535 ("[B]y opening the interior spaces of Cincinnati's city hall to private groups under [a sponsorship regulation], the City has not created a traditional public forum because the regulation does not make City Hall's interior space as open to public discourse as a sidewalk or park. Nor does the regulation allow the City to treat that space as a designated public forum."). In a limited public forum, the government need not

-12-

allow persons to engage in every type of speech, *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106 (2001), and may exclude a speaker who is not a member of the class for whose special benefit the forum was created, *Cornelius*, 473 U.S. at 806. However, the State's power to restrict speech in a limited public forum is not without limits. If the Government reserves a limited public forum to certain groups or certain purposes, a restriction on free speech therein will be upheld so long as it does not discriminate based on viewpoint and is reasonable in light of the purpose served by the forum. *Good News Club*, 533 U.S. at 106-07.

Finally, a nonpublic forum is publicly owned property that is not by tradition or governmental designation a forum for public communication. *Cincinnati*, 622 F.3d at 535 (citing *Helms v. Zubaty*, 495 F.3d 252, 256 (6th Cir. 2007)). The government may regulate speech in a nonpublic forum "'based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral.'" *Id.* (quoting *Cornelius*, 473 U.S. at 802).

Though public universities "possess[] many of the characteristics of a [traditional] public forum, such as open sidewalks," they differ in significant respects insofar as public universities' purpose, or mission, is "education and the search for knowledge—to serve as a 'special type of enclave' devoted to higher education." *Bowman v. White*, 444 F.3d 967, 978 (8th Cir. 2006) (citing *United States v. Grace*, 461 U.S. 171, 180 (1983)). *See also Widmar v. Vincent*, 454 U.S. 263, 274 n.5 (1981); *Gilles v. Blanchard*, 477 F.3d 466, 470 (7th Cir. 2007) ("Public property is property, and the law of trespass protects public property, as it protects private property, from uninvited guests.")). As such, and for purposes of a forum analysis, "First Amendment rights must be analyzed 'in light of the special characteristics of the school environment.'" *Widmar*, 454 U.S.

-13-

at 268 n.5 (citing *Tinker v. Des Moines Indep. Comm. Sch. Dist.*, 393 U.S. 503, 506 (1969)). In light

of schools' educational mission, the Supreme Court has upheld "a university's authority to impose

reasonable regulations compatible with that mission upon the use of its campus and facilities." *Id.*

This guidance leads lower courts to the conclusion that open areas on public university campuses

are limited public fora, and that restrictions on speech therein are permissible as long as such

restrictions do not discriminate based on viewpoint and are reasonable in light of the universities'

educational mission. *See, e.g.*, *Bloedorn v. Grube*, 631 F.3d 1218, 1232-33 (finding that a

university's sidewalks, pedestrian mall, and rotunda fell into the category of a limited public forum);

*Garland*, 281 Fed. App'x at 511 (rejecting the notion that open areas on a public university campus

are traditional public fora); *Bowman*, 444 F.3d at 977 (finding that although on-campus open areas

had "the physical characteristics of streets, sidewalks, and parks, and are open for public passage,"

the areas were not traditional public fora); *ACLU Student Chapter-Univ. of Md., College Park v.

Mote*, 423 F.3d 438, 443-44 (4th Cir. 2005) (concluding that the principals of *Widmar* dictate that

a college campus is a limited public forum); *Miller*, 501 F. Supp. 2d at 948; *Gilles v. Hodge*, 2007

WL 1202706, *3 (S.D. Ohio Apr. 20, 2007), *rev'd on other grounds by Garland*, 281 Fed. App'x

501; *Bourgault v. Yudof*, 316 F. Supp. 2d 411, 418-20 (N.D. Tex. 2004) (noting that "no court has

found a university's campus to be a traditional public forum", and finding that because the university

had not opened its property to the general public, its campus was a limited public forum).

　　　　Like all public universities, UT's mission is education, and UT is not required to treat

the open areas of its campus as traditional public fora. McGlone has not set forth any facts indicating

that UT dedicated any portion of its campus for use as a traditional or designated public forum. *See

Cincinnati*, 622 F.3d at 535. Quite the contrary: UT's sponsorship policy requires speakers to obtain

-14-

sponsorship from a student organization or faculty or staff member prior to speaking in the open areas of UT's campus. By enacting the campus access and sponsorship policies, UT exercised its prerogative, consistent with its educational mission, to limit expressive activities in and around campus and to open its grounds to some—but not all—speakers. *See Mote*, 423 F.3d at 444 ("There is nothing in the record to indicate that until the policy at issue here was implemented, the campus was anything but a non-public forum for members of the public not associated with the university. By implementing its policy the University made the campus a limited public forum."). Accordingly, the Court finds that the open areas of UT's campus are limited public fora, and UT may make restrictions on speech therein, so long as the restrictions do not discriminate based on viewpoint and are reasonable in light of the purpose served by the forum. *Good News Club*, 533 U.S. at 106.

### ii. Content-Neutral and Reasonableness Determination

McGlone has not offered any evidence, or even an allegation, that UT's sponsorship policy is not facially content-neutral. The policy requires a visitor to secure student sponsorship in order to speak on campus, regardless of the subject of the visitor's message or the visitor's viewpoint on that subject. The policy applies indiscriminately to all visitors who would conduct a speech on campus. *See* Garland, 281 Fed. App'x at 511. Furthermore, there is nothing in the language of the policy that encourages selective application of the policy by the Dean of Students; whether a speaker has obtained sponsorship, and whether the university can make the "physical arrangements" necessary to accommodate the speaker in light of time and space limitations, are the only criteria upon which the university evaluates a request to speak on campus.

In addition, the pleadings are devoid of any evidence that the sponsorship policy results in content or viewpoint discrimination as applied. McGlone's argument is premised on the

-15-

fact that if a student group of faculty or staff member disagrees with a speaker's viewpoint, they will not sponsor him. This premise does not rise to impermissible viewpoint discrimination. *See Bourgault*, 316 F. Supp. At 420. There has been no allegation that "student organizations are only permitted by [the university] if they hold certain beliefs, or that students would be prohibited from forming organizations because of their viewpoint on a particular topic." *Id.* at 420-21; *see also Miller*, 501 F. Supp. 2d at 949-50 (finding that a plaintiff's First Amendment challenge to a sponsorship policy was unlikely to succeed on the merits, based in part on the fact that "[t]here is no allegation that [university] officials restrict the student organizations based upon content of prospective speech"). Nor does McGlone claim that UT discriminates based on viewpoint in permitting people to become members of the UT community, or that the school has a history of selective sponsorship or discrimination against certain subjects or viewpoints.

　　　　Viewpoint neutrality requires not just that a government entity refrain from explicit viewpoint discrimination, but also that it provide adequate safeguard to protect against the improper exclusion of viewpoints. *See Bd. of Regents v. Southworth*, 529 U.S. 217, 235 (2000). The Court extensively addresses this subject in Part IV.A.2, finding that UT has done just that. By permitting an outsider to speak on campus so long as he or she obtains sponsorship from one student organization, faculty, or staff member, UT allows sponsorship to be obtained from any of its 17,000 students and 8,161 faculty and staff members, who undoubtedly hold a vast spectrum of viewpoints. In addition, "Hilltopics" contains a number of safeguards against violation of First Amendment rights. It provides that "[t]here are no restrictions to control the point of view expressed by speakers other than those imposed by local, state, and federal laws. Any person sponsored . . . is free to speak." [Mot. to Dismiss, Attach. 1, at 3.] It also orders that the event-scheduling process is not to

-16-

be used "as a device for a prior restraint of speakers." *Id.* Accordingly, the Court concludes that the speech policy is content-neutral on its face and as applied.

Regarding the "reasonable relationship" requirement, many federal courts have found sponsorship requirements a reasonable means by which public universities may restrict use of their campuses for public speaking. *See, e.g.*, *Bloedorn*, 631 F.3d at 1233-34 (finding that the plaintiff was unlikely to succeed on the merits of his First Amendment challenge to a university policy under which speakers who were not sponsored by a campus organization had to request a permit to initiate a gathering on campus); *Blanchard*, 477 F.3d at 472-74 ("[A university] could use neutral criteria for access, such as that an outsider must be invited to speak on campus by a faculty member or a student group."); *Mote*, 423 F.3d at 445 (affirming summary judgment in favor of a university which designated one area of its campus for the distribution of literature and limited the rest of campus to the university community and those who obtained sponsorship from a member of the university community); *Miller*, 501 F. Supp. 2d at 948-49 (finding that plaintiff's challenge was unlikely to succeed on the merits because the student-sponsorship requirement "further[ed] [the university's] educational mission . . . because speech is thereby limited to matters in which at least one group of students is interested"); *Bourgault*, 316 F. Supp. 2d at 420-21 (finding that the plaintiff was unlikely to succeed on the merits of his First Amendment challenge to a policy requiring that off-campus speakers be sponsored by student organizations). In fact, though McGlone argues that its reasoning has been rejected and its holding therefore implicitly overruled, in *Smith v. Ellington* this Court upheld as a "[r]easonable regulations of campus activities by university officials" the precise UT policies at issue in this case. 334 F. Supp. 90, 93 (E.D. Tenn. 1971). Though his analysis in *Gilles v. Blanchard* dispensed with the formulaic forum analysis employed by most courts, Judge Posner

extolled the virtues of a sponsorship policy, which "by decentralizing the invitation process assures nondiscrimination, and a reasonable diversity of viewpoints consistent with the university's autonomy and right of self-governance." 477 F.3d at 474.

The Sixth Circuit's recent holding in *Gilles v. Garland*, which the Court fully considers *infra* in Part IV.A.1.b.i, does not dictate a finding that UT's sponsorship policy was not content neutral or that it did not have a reasonable relationship to UT's educational mission. In its First Amendment analysis in *Garland*, the Sixth Circuit detailed the aforementioned standards of review, and noted that the plaintiff "has not alleged or otherwise demonstrated that the sponsorship requirement is not content-neutral or not reasonably related to the university's educational mission." 281 Fed. App'x at 512. However, the court was compelled to vacate the district court's order dismissing the free speech claim in light of its other findings:

> Nevertheless, inasmuch as we have concluded that plaintiff's due process vagueness challenge is not facially meritless and that further proceedings are warranted to define the contours of the unwritten speech policy and its operation, we are loath to conclude that plaintiff undoubtedly can prove no set of facts consistent with his allegations that would entitle him to relief under his free speech claim. Because the policy remains ill-defined, we are unwilling to conclude at this stage that plaintiff's claim necessarily must fail.

*Id.* The Sixth Circuit's remand of the Free Speech claims in *Garland* was dependent on its finding that the unwritten sponsorship policy was void for vagueness. The court in no way overruled or rejected prior courts' holdings regarding the reasonableness of university sponsorship policies; to the contrary, the Court acknowledged that "analogous student sponsorship requirements have been upheld as reasonable restrictions on speech." *Id.* at 511 (citing *Blanchard*, 477 F.3d at 472-74; *Bowman*, 444 F.3d at 980-81; *Miller*, 501 F. Supp. 2d at 948-49).

-18-

UT's purpose is education, and its sponsorship policy is reasonable in light of this educational mission and UT's significant interests in promoting the orderly conduct of activities on campus, protecting the educational experience of the students, ensuring public safety, allowing for coordination of use of limited space by multiple entities. The Court also notes that public universities have limited resources and limited personnel, which they have an interest in reserving for members of the university community. *See Mote*, 423 F.3d at 445. Unlike the unwritten policy at issue in *Garland*, UT's restriction is well delineated in UT's official university policies and in its student handbook. The policy also is tailored to serve UT's significant interests because it only limits on-campus speech by visitors to matters or subjects in which at least one group of students is interested. *See Miller*, 501 F. Supp. 2d at 948-49. So long as one student organization or faculty or staff member sponsors a speaker, and subject only to certain time and safety restrictions, that speaker may speak on any subject and with any viewpoint without restriction from the university. The policy also provides those speakers who are unable to obtain sponsorship ample opportunity to convey their message to the UT community. Persons unable to obtain sponsorship are at liberty to speak on the sidewalks and streets bisecting campus that are owned by the City of Knoxville, as such areas are expressly excluded from the access and speech policies. "Hilltopics," at 24.

UT's sponsorship policy is content neutral on its face and as applied, and is reasonable in light of the university's educational mission. Accordingly, the Court holds that the policy does not violate McGlone's First Amendment rights.

### b.    Due Process

McGlone's due process challenge to UT's sponsorship policy is two-pronged, based on vagueness and overbreadth theories.

### i.      Vagueness

Due process requires a state enactment to be held void for vagueness if its "prohibitive terms are not clearly defined such that a person of ordinary intelligence could readily identify the applicable standard for inclusion and exclusion." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).The absence of clear standards or objective criteria guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors. *See Leonardson v. City of East Lansing*, 896 F.2d 190, 198 (6th Cir. 1990). The void-for-vagueness doctrine not only ensures that laws provide "fair warning" of prescribed conduct, but it also protects citizens against the impermissible delegation of basic policy matters "for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *United Food & Comm. Workers Union Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 358-59 (6th Cir. 1998). The doctrine "requires that the limits the [government] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988). A statute or policy is unconstitutionally vague and offends the First Amendment when it grants a public official unbridled discretion such that the official's decision to limit speech is not constrained by objective criteria, but may rest on ambiguous and subjective reasons. *United Food*, 163 F.3d at 358-59.

In *Smith v. Ellington*, this Court upheld the same TU policy challenged in the instant case in the face of First Amendment, vagueness, and overbreadth challenges. 334 F. Supp. at 90. Regarding the plaintiff's contention that the policy vested officials with "too great a discretion," the Court concluded that "[t]he language appears to be sufficiently clear to be understood by the

ordinary person, particularly a University student. *Id.* at 93 (quoting *Sellers v. Regents of the Univ. of Cal.*, 432 F.2d 493 (9th Cir. 1970)). In addition, several other courts have upheld or defended sponsorship requirements against vagueness challenges. *Blanchard*, 477 F.3d at 472; *Miller*, 501 F. Supp. 2d at 949. In *Blanchard*, the Seventh Circuit upheld a policy at Vincennes University which purported to require prior approval by the dean of students of all sales and solicitations on campus, but which had the effect of permitting any student group to invite any speaker to speak on campus. *Id.* at 468, 472-74 (("[A university] could use neutral criteria for access, such as that an outsider must be invited to speak on campus by a faculty member or a student group.").

Similarly, in *Gilles v. Miller*, a district court in the Western District of Kentucky declined to issue a permanent injunction against a Murray State University policy that provided: "Any outside organization wishing to come on campus for the purpose of solicitation must be sponsored by a registered MSU organization or university department." Regarding the plaintiff's allegation of vagueness, the *Miller* court found that "[t]he prohibitive terms are clearly defined so as a person of ordinary intelligence could readily define the standard for inclusion and exclusion. All solicitation is prohibited unless invited by an MSU student organization or university department." *Id.* (citing *Hodge*, 2007 WL 1202706, at **8-9). However, Plaintiff insists that the Sixth Circuit's holding in *Garland*, which vacated the district court's holding in *Hodge*, undermined and "effectively overruled" the holdings of both *Smith* and *Miller* and mandates a finding that the UT campus use policy at issue is unconstitutional.

McGlone's argument that UT's sponsorship policy is void for vagueness relies heavily on the Sixth Circuit's recent opinion in *Gilles v. Garland*. In *Garland*, the Sixth Circuit vacated the holding of *Gilles v. Hodge*, in which the district court dismissed a due process claim

-21-

against a university's "policy and consistent practice" of permitting on-campus visitor speech only when the visitor was invited to speak by the university or by a recognized student organization. 281 Fed. App'x 501. The undisputed facts indicated that the sponsorship requirement was unwritten and did not emerge until over a month after the plaintiff was denied permission to speak on campus. *Id.* at 506-07. The court was compelled by the plaintiff's argument that the "standards guiding officials' discretion can hardly be found to be sufficiently clear where the policy has not even been reduced to writing" and where the policy emerged *after* the plaintiff was denied permission to speak. *Id.* The court also noted that the facts, such as a campus security officer's statement to the plaintiff that the plaintiff's speech was prohibited because it was not considered "legitimate business," indicated that the policy was "*not* well understood by university officials charged with the most immediate responsibility for enforcing it." *Id.* at 507 (emphasis in original). Finally, the court noted that the policy contained "no standards by which student groups are to judge [speaker] requests . . . . [N]either is there anything in the policy that guides discretion and restrains abuse." *Id.* at 508. Though it noted that "proof of plaintiff's free speech claim is improbable and recovery unlikely," the court concluded that the "unwritten 'policy' . . . appears to be devoid of standards and is facially vulnerable to due process challenge." *Id.*

The *Garland* court acknowledged that other student sponsorship requirements had been upheld as reasonable restrictions on speech. *Id.* (citing *Blanchard*, 477 F.3d at 472-73; *Bowman*, 444 F.3d at 980-81; *Miller*, 501 F. Supp. 2d at 948-49). In fact, rather than "directly conflict[ing]" with and "effectively overrul[ing]" *Miller*, which McGlone insists was the effect of *Garland*, the Sixth Circuit cited *Miller* with approval at least three times. *Id.* at 510, 511-12; [Reply in Supp. of Mot. for Prelim. Inj., Doc. 23, at 2.] Though *Garland* vacated the lower court's opinion

-22-

in *Hodge*, it is evident that the Sixth Circuit had no intention of also overruling the Eastern District of Kentucky's similar line of reasoning in *Miller*. It is evident, therefore, that the facts of *Hodge*--- namely the unwritten policy that emerged a month after the denial of speaking rights---mandated reversal while the facts surrounding the written sponsorship policy in *Miller* did not. Along that same line of reasoning, the Sixth Circuit distinguished the *Hodge* policy from that at issue *Blanchard*, which was written, "well-established and fairly applied." *Garland*, 281 Fed. App'x at 507-08 (citing *Blanchard*, 477 F.3d at 472).

McGlone also bases his due process argument on *Miller v. City of Cincinnati*. In *Cincinnati*, a lobbying group was denied access to the lobby of Cincinnati's city hall because the group did not have sponsorship from a city council member or a city department, as required by the city's administrative regulations. 622 F.3d at 528-30. The Sixth Circuit enjoined the enforcement of the city regulation, finding that the policy:

> [G]ives complete discretion to council members and department heads to select whom they will sponsor. The only direction provided is that the purpose of the interior of city hall is to allow City officials "to exercise the rights and responsibilities specified in the Charter of the City of Cincinnati." Without further specificity, this directive offers no meaningful guidance. We conclude that the plaintiffs have established a substantial likelihood of success with regard to the merits of their void-for-vagueness claim.

*Id.* at 540. In his reply brief in support of his Motion for a Preliminary Injunction, Plaintiff correctly states that *Cincinnati* stands for the proposition that "Policies that make forum access dependent on a government official's unbounded discretion to grant 'sponsorship' are constitutionally invalid" as void for vagueness. [Reply in Supp. of Mot. for Prelim. Inj., at 2.] *Cincinnati* did not mention any of the university or student sponsorship cases on which the parties base their arguments. However,

-23-

McGlone urges that the sponsorship requirement in *Cincinnati* is no different in language or in effect from UT's sponsorship requirement.

  *Cincinnati* is inapplicable to the instant case. First, McGlone's attempt to paint *Cincinnati* as controlling ignores the plethora of case law highlighting the unique nature and mission of a university campus and upholding universities' right to limit the use of their campuses to those for whose benefit it exists. *See, e.g.*, *Widmar*, 454 U.S. at 268; *Bloedorn*, 631 F.3d at 1218; *Garland*, 281 Fed. App'x at 509-11; *Bowman*, 444 F.3d at 978; *Mote*, 423 F.3d at 444-45. More importantly, *Cincinnati* involved a policy under which *only* government officials could decide who would be granted access to the government facilities. Under UT's campus access and sponsorship policies, any member of the UT community may invite any speaker of his or her choosing to speak on campus. That UT officials, including Deans Davis and Smith, are some of the many parties on campus who may grant sponsorship does not amount to impermissible grant of unbridled discretion to government officials. The Government Speech Doctrine acknowledges that the First Amendment does not regulate government speech, and that the government is entitled "to say what it wishes and to select the view that it wants to express." *Pleasant Grove*, 129 S. Ct. at 1131 (citing *Johanns v. Livestock Marketing Ass'n*, 544 U.S. 550, 553 (2005); *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 833 (1995)). So long as they do not have unbridled discretion to limit speech on campus, UT officials are free under the Government Speech Doctrine to enter the campus's "marketplace of ideas" and invite a speaker to campus to express a certain message.

  McGlone also relies on a third case, *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Sch.*, 457 F.3d 376 (4th Cir. 2006), to support his notion that a school-wide sponsorship requirement can allow unbridled discretion. However, the facts of that case provide no

-24-

basis for such a contention. In *Child Evangelism Fellowship*, the school policy at issue provided that the Montgomery County Public School system "may approve . . . for distribution" flyers "from" or "sponsored or endorsed by" five groups of "listed organizations." *Id.* at 380. The MCPS also had the power to withdraw approval of any flyer that it determined "undermine[s] the intent of this policy." *Id.* The court's qualm with the policy was not with its grant of power to the "listed organizations" to sponsor or endorse a flyer; rather, it was with the fact that "the policy imposes *no* guidelines as to how MCPS should exercise [its] unlimited discretion" to approve or withdraw the flyers. *Id.* at 387. Such power reserved "virtually unlimited discretion" to a government entity to control access to speech. *Id.* The court called the MCPS's bluff: "What MCPS cannot do is what it has done here: assertedly limit access to certain purportedly neutral speakers but actually reserve to itself unbridled discretion to permit or deny access to any speaker for any reason it chooses." *Id.* at 389. The holding of *Child Evangelism Fellowship* in fact supports the position advocated by UT, which lawfully reserved discretion to tens of thousands of neutral speakers.

Like the policies in *Blanchard* and *Miller*, and unlike the unwritten and post hoc "policy" in *Garland*, UT's sponsorship requirement is not vague and does not give UT officials unbridled discretion to restrict speech. The terms of the well-established, forty-year-old policy are clearly defined so as a person of ordinary intelligence could readily define the standards for inclusion and exclusion. *See Miller*, 501 F. Supp. 2d at 950. *All* outside visitors' speech is prohibited unless sponsored by a member of the UT community. If a member of the UT faculty, staff, or student group sponsor a speaker, that speaker is permitted on campus, and if they do not sponsor the speaker, that speaker is not permitted on campus. Further, the power bestowed upon students,

faculty, and staff members to grant sponsorship does not implicitly give any of those groups the power to deny or revoke potential speakers' sponsorship from another group.

Nothing in the policy permits UT officials to limit speech based on ambiguous or subjective criteria. McGlone insists that the sponsorship policy confers "unbridled discretion" on public officials, because the policy contains "no limitations or restrictions limiting the discretion of a registered student organization, faculty, or staff in choosing whether to sponsor a particular speaker." (Compl. ¶ 51.) However, McGlone's protestations about the lack of guiding criteria or limitations on discretion ignore the fact that surrounding the access and sponsorship policies in the UT student handbook are numerous safeguards against abuse, as well as specific guidelines and procedures by which students are to discharge their authority to sponsor speakers and by which the Dean of Students must plan for said speakers. First, the student handbook is replete with provisions highlighting the importance of First Amendment rights on campus. The policy ensures that, so long as a speaker is sponsored, "[t]here are no restrictions to control the point of view expressed by speakers other than those imposed by local, state, and federal laws. Any person sponsored by a registered campus organization is free to speak." [Mot. to Dismiss, Attach. 1, at 3.] Second, it contains procedural standards. It expressly instructs students to "register the name of the speaker, the date and time of the appearance, and such pertinent information as will facilitate adequate physical preparations and adequate publicity for the event with the Office of the Dean of Students." *Id.* It warns students that "reasonable notice" is necessary to arrange for on-campus speakers. *Id.* Finally, the policy specifies that the Dean's only criterion for a negative decision regarding a sponsored visitor's ability to speak is a "demonstrable inability to make such physical arrangements." *Id.* The handbook orders officials not to use the event-scheduling process "as a

-26-

device for a prior restraint of speakers." *Id.* Even a "negative decision" for scheduling purposes does not foreclose a speaker's ability to speak on campus; rather, the policy urges the sponsoring organization to seek a more suitable date. *Id.* Such safeguards and standards prevent unbridled discretion on the part of the officials overseeing the sponsorship process.

Finally, the pleadings contain no allegation that UT officials or other members of the UT community have a history of denying sponsorship based on ambiguous or subjective reasons. Despite the policy's forty-year history, McGlone does not claim that the policy is not "well-established and fairly applied." *Garland*, 281 Fed. App'x at 507-08.

The Court cannot conclude that a policy which grants to all members of the UT community the ability to invite speakers to campus is unconstitutionally vague or confers "unbridled discretion" on public officials. To the contrary, such a policy "decentraliz[es] the invitation process" and "assures nondiscrimination, and a reasonable diversity of viewpoints consistent with the university's autonomy and right of self-governance." *Blanchard*, 477 F.3d at 474. The Court finds that McGlone has failed to plead sufficient facts to state a claim that UT's policy is unconstitutionally vague.

### ii. Overbreadth

Overbreadth analysis considers whether a regulation sweeps within its ambit protected activities as well as unprotected ones. A policy is unconstitutionally overbroad when there exists "'a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court.'" *Leonardson v. City of E. Lansing*, 896 F.2d 190, 195 (6th Cir. 1990) (quoting *City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801 (1984)). "Underlying the overbreadth doctrine is the concern that an overbroad statute will 'chill'

the exercise of free speech and expression by causing 'those who desire to engage in legally protected expression . . . [to] refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'" *Hodge*, 2007 WL 1202706, *9 (quoting *Board of Airport Comm'rs v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (internal citation omitted)). However, to invalidate a law on overbreadth grounds, the "impermissible applications of the law" must be "substantial when 'judged in relation to [its] plainly legitimate sweep.'" *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973)). If a law does not reach a substantial amount of constitutionally protected conduct, the overbreadth challenge must fail.

UT's sponsorship policy is not overbroad. As noted in the Court's analysis above, visitors to UT's campus do not have an absolute constitutional right or entitlement to speak in the open areas of campus; even as a public university, UT has the right to limit public speaking on its campus by visitors. UT's sponsorship policy is properly drafted and narrowly tailored to accomplish this mission. Nothing in the pleadings indicates that the policy sweeps or has any implications whatsoever outside of its lawful regulation of outside speakers' ability to speak on campus. There also is no evidence that the sponsorship policy has a deterrent or chilling effect on the persons for whom the university's limited public forum is dedicated: the members of the UT community. Accordingly, McGlone has pleaded no facts that would support an overbreadth challenge to UT's sponsorship policy.

Finally, the Court notes that there it no merit to McGlone's contention that the UT's sponsorship policy amounts to a heckler's veto, or "an attempt by those who dislike a speaker to create such a disturbance that the speaker must be silenced." *Gaughan v. City of Cleveland*, 212 Fed.

App'x 405, 415 (6th Cir. 2007) (citing *Ams. United for Separation of Church & State v. City of Grand Rapids*, 980 F.2d 1538, 1553 (6th Cir. 1992)). Because the pleadings in this case do not establish that McGlone's First Amendment or Due Process claims have facial plausibility, dismissal for failure to state a claim under Rule 12(b)(6) is appropriate.

### 2. Qualified Immunity

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 129 S. Ct 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). It is both a defense to liability and an entitlement not to stand trial or face other burdens of litigation. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine balances two important interests: (1) the need to hold public officials accountable when they exercise power irresponsibly; and (2) the need to shield officials from distraction and liability when they perform their duties reasonably. *Pearson*, 129 S. Ct at 815.

To determine if qualified immunity applies, the Court must decide whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and if so, whether the right at issue was "clearly established" at the time of Defendants' alleged misconduct. *Saucier v. Katy*, 533 U.S. 194, 202 (2001); *Dorsey v. Barber*, 517 F.3d 389, 394 (6th Cir. 2008). A right is "clearly established" if " it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted," *Saucier*, 533 U.S. at 202, and "if there is leading precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point," *Risbridge v. Connelly*, 275 F.3d 565, 569 (6th Cir. 2002). However, there need not be a prior case directly on point for a law to be clearly established. *Kennedy v. City of*

*Cincinnati*, 595 F.3d 327, 337 (6th Cir. 2010). The Court exercises its sound discretion to decide which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case. *Pearson*, 129 S. Ct at 818. If no constitutional right would have been violated even if the allegations were established, then no further inquiry is necessary. *Saucier*, 533 U.S. at 201.

In light of the Court's finding above that McGlone has not shown a likelihood of success on the merits of his free speech, overbreadth, and vagueness claims, the Court finds that McGlone has not sufficiently alleged a violation of the First and Fourteenth Amendments. No constitutional right would have been violated even if the allegations in the Complaint were established, and no further inquiry is necessary. *See Saucier*, 533 U.S. at 201.

### 3.      Eleventh Amendment

Defendants also seek to dismiss McGlone's claims to the extent that McGlone is attempting to assert a § 1983 claim for money damages against them in their official capacities as state employees. The Eleventh Amendment provides: "The Judicial power of the United States shall not construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. 11. It precludes suits in federal court for monetary damages against state entities. *Underfer v. University of Toledo*, 36 Fed. App'x 831, 834 (6th Cir. 2002) (citing *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996)). *But see Stringfield v. Graham*, 212 Fed. App'x 530, 535 (6th Cir. 2007) (quoting *Williams v. Commonswealther of Ky.*, 24 F.3d 1526, 1544 (6th Cir. 1994) ("The Eleventh Amendment does not bar § 1983 actions brought against state officials in their official capacities seeking prospective injunctive relief."). Claims against public universities and university

officials acting in their official capacities are considered actions against the state for purposes of the Eleventh Amendment. *Hafer v. Melo*, 502 U.S. 21 (1991).

Plaintiff's Complaint states: "Plaintiff John McGlone seeks injunctive relief, declaratory relief, and nominal damages against Defendants Jimmy G. Cheek, in his official capacity as Chancellor of University of Tennessee at Knoxville; Maxine Davis, individually and in her official capacity as Dean of Student Affairs at University of Tennessee at Knoxville; and Angi Smith, individually and in her official capacity as Associate Dean of Students at University of Tennessee at Knoxville." [Compl. ¶ 2.] Plaintiff's Prayer for Relief requests "nominal damages arising from the acts of the Defendants as an important vindication of his constitutional rights." *Id.* Prayer*, § E.* Nowhere in the Complaint does Plaintiff restrict this request for nominal monetary damages to Defendants in their individual capacities. To the extent that McGlone sought to recover any monetary damages against Defendants in their individual capacities, Defendant's motion to dismiss on Eleventh Amendment grounds is granted.

**B.     Motion for a Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy designed to preserve the relative positions of the parties until a trial on the merits can be held." *Bell*, 2010 WL 3257551, at *7 (citing *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 447 (6th Cir. 2009)). Federal district courts balance the following four factors to determine whether to order a preliminary injunction: (1) whether the movant has established a substantial likelihood or probability of success on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the

public interest would be served by granting injunctive relief. *Cincinnati*, 622 F.3d at 533 (citing *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).

In the context of First Amendment violations, the "likelihood of success on the merits" factor often is determinative, *id.* (citing *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998)), because the "loss of First Amendment freedoms, for even minimal periods of time," is presumed to constitute irreparable harm, *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). To the extent that a plaintiff demonstrates a substantial likelihood of success on the merits of his or her First Amendment claim, the plaintiff also establishes the likelihood of irreparable harm as a result of a loss of First Amendment rights. *Connection Distrib. Co.*, 154 F.3d at 288. Conversely, "where there is not been a showing of a likelihood of success on a First Amendment claim, a plaintiff cannot establish irreparable harm." *Laborers' Intern. Union of N.A., Local 534 v. Hodge*, 2011 WL 5597261, *6 (S.D. Ohio Nov. 17, 2011) (citing *Wappler v. Kleinsmith*, 2009 WL 483223, *3 (W.D. Mich. Feb. 24, 2009); *Montgomery v. Carr*, 848 F. Supp. 770, 777 (S.D. Ohio 1993)).

The reasoning that supports the Court's finding that McGlone has failed to state a claim upon which relief could be granted also supports findings that McGlone has not shown a likelihood of success on the merits of his constitutional claims and, therefore, that McGlone has not shown irreparable harm. Furthermore, because McGlone does not have a constitutional right to speak without sponsorship on the open areas of UT's campus, McGlone has not shown that granting an injunction would not cause harm to Defendants or to the public interest. UT's campus use policy appears to be narrowly tailored to serve UT's significant governmental interests in maintaining order, preventing the interruption of its educational mission, ensuring public safety, and allowing for coordination and use of limited space by multiple entities. It is in the interest of UT and the

-32-

general public to enforce such a policy. Accordingly, the court holds that a preliminary injunction will not issue, and Plaintiff's motion therefor will be denied.

**V.      Conclusion**

For the reasons stated herein, the Court finds that UT's campus access and sponsorship policies are fully consistent with the Constitution and the case law interpreting it. Plaintiff John McGlone has failed to state a claim upon which relief can be granted and has not satisfied the four prerequisites to obtain injunctive relief. Accordingly, it is hereby **ORDERED** that Plaintiff's Motion for a Preliminary Injunction [Doc. 7] is **DENIED**, Defendants' Motion to Dismiss [Doc. 18] is **GRANTED**, and this case is **DISMISSED**.

**IT IS SO ORDERED**.

ENTER:

_____s/ Thomas W. Phillips_____
United States District Judge

-33-